## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NICHOLAS R. INGRAO, derivatively on behalf of GENEDX HOLDINGS CORP. formerly SEMA4 HOLDINGS CORP., | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. |
| JASON RYAN, KATHERINE STUELAND, ELI D. CASDIN, EMILY LEPROUST, KEITH MEISTER, RICHARD C. PFENNINGER, JR., JOSHUA RUCH, RACHEL SHERMAN, NAT TURNER, DENNIS CHARNEY, MICHAEL PELLINI, ERIC SCHADT, ISAAC RO, and RICHARD MIAO, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| GENEDX HOLDINGS CORP., formerly SEMA4 HOLDINGS CORP., | ) ) ) |
| Nominal Defendant. | ) |

### <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Nicholas R. Ingrao ("Plaintiff"), by and through his undersigned counsel, brings

this action derivatively on behalf of nominal defendant GeneDX Holdings Corp., formerly Sema4

Holdings Corp. ("GeneDX", "Sema4", or the "Company")[1] against certain current and/or former

members of its Board of Directors (the "Board") and executive officers seeking to remedy the

---

[1] On May 2, 2022, Sema4 Holdings Corp. acquired GeneDx and the combined company was renamed "GeneDx Holdings Corp." References herein to "Sema4" refer to actions taken by the Company prior to its name change following the GeneDx acquisition.

Individual Defendants' (defined below) violations of state law, including breaches of fiduciary duties and unjust enrichment, as well as violations of the federal securities laws. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, statements made by the Company and the Individual Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GeneDX, news reports, securities analysts' reports, court filings in related civil lawsuits, advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.[2]

## I.    INTRODUCTION

1.    This is a shareholder derivative action brought for the benefit of nominal defendant GeneDX against the Individual Defendants, who are certain of the Company's current and/or former officers and directors, based on their breaches of fiduciary duty and other serious misconduct from January 2022 through August 2022 (the "Relevant Period"), as alleged in detail herein. This derivative action is based on a scheme perpetrated by the Individual Defendants during the Relevant Period, which included the issuance of a series of materially false and misleading statements to stockholders on January 18, 2022, March 14, 2022, May 12, 2022, and June 16, 2022, described herein.

2.    As a result of the Individual Defendants' serious misconduct during the Relevant Period, the Company has become the subject of a sustained federal securities fraud class action in

---

[2]    On June 26, 2025, Plaintiff issued an inspection demand to the Company pursuant to 8 *Del. C.* § 220. Subsequently, Plaintiff and the Company negotiated a document production pursuant to a confidentiality agreement executed on August 5, 2025. The Company has yet to make the document production to Plaintiff, however, and Plaintiff intends to file an amended complaint after receiving, reviewing, and analyzing the production. Plaintiff files this derivative action at this time in order to ensure the Company's claims are timely asserted.

the U.S. District Court for the District of Connecticut, captioned *Nabil Helo v. SEMA4 Holdings Corp., et al.*, Case No. 3:22-cv-01131-KAD (the "Securities Action"), as discussed further herein. The operative complaint in the Securities Action (the "Securities Complaint") was filed on September 13, 2024, and is based in part on the detailed accounts of three former employees of the Company ("FEs"), certain of whom were employed in senior leadership roles.

3.      The Company is a health diagnostics testing company, with a stated mission "to use artificial intelligence [] to enable personalized medicine for all." During the Relevant Period, the Company derived the majority of its revenues from its diagnostic testing focused on women's health and oncology but sought to shift its core business to data and analytics solutions. Specifically, Sema4 sought to build and commercialize its health intelligence platform called Centrellis.

4.      Although Sema4 had suffered net losses since its inception and was critically low on cash, its prospects appeared to improve greatly when it was announced in a press release at the start of the Relevant Period on January 18, 2022, that Sema4 reached a deal to acquire GeneDx, a leader in rare disease genomic testing and analysis.

5.      Sema4 announced that the business combination, which was expected to close in the second quarter of 2022, was "projected to deliver $350 million in pro forma 2022 revenue", and that GeneDx's rare disease diagnostic and exome sequencing services would "***strengthen Sema4's 12 million de-identified clinical records for Centrellis, its proprietary health intelligence platform .... Sema4 plans to leverage this combined health information database to transform patient care and therapeutic development and enable precision medicine for all***."[3]

---

[3]      All emphasis herein is added unless otherwise noted.

6.      Throughout the Relevant Period, the Individual Defendants touted Centrellis as a highly sophisticated, multi-layered platform with artificial intelligence ("AI")-driven analytical capabilities which would purportedly allow the Company to leverage the vast amount of human health data that it had obtained through its health system partnerships.

7.      For example, the Individual Defendants stated in the Company's Annual Report on Form 10-K filed with the SEC on March 14, 2022 (and signed by a majority of the current members of the Board) that Centrellis was "a sophisticated data management and analytics engine" which had the ability to mine and analyze health data "across multiple therapeutic areas" using "state-of- the-art AI, probabilistic causal reasoning and machine learning approaches" to "construct predictive models" that would "transform the disease and diagnosis treatment paradigm for the entire healthcare ecosystem: patients, physicians, health systems, payers, and Biopharma companies."

8.      However, as alleged in the Securities Complaint based on the accounts of the high-ranking FEs, the Individual Defendants' public representations about the abilities and potential of Centrellis could not have been further from the truth. For example, according to one of the FEs ("FE 1"), described in the Securities Complaint as having served as the Company's Senior Vice President, Production Bioinformatics from February 2020 through September 2022, the Individual Defendants represented that Sema4 had developed an AI-driven data management and analytics platform called Centrellis in order to tout the Company as a data company rather than just a diagnostics company and increase the Company's valuation, but in fact Centrellis was nonexistent.

9.      In addition, per the account in the Securities Complaint of another FE described therein as having served as the Company's Senior Vice President of Business Development from

September 2020 through February 2023 ("FE 2"), Centrellis could not utilize data in any meaningful way in accordance with its stated capabilities. According to FE 2's account, the Company's focus was on obtaining as many health system partners as possible, to obtain large amounts of human health data, but Centrellis could not do anything with that data. In FE 2's view, the Company would have needed billions of additional dollars and "many years" of additional work before Centrellis would have been able to achieve its stated capabilities.

10.    Similarly, according to the account of the FE described in the Securities Complaint as having served as the Company's Chief Information Officer ("CIO") from September 2021 through mid-2023 ("FE 3"), Centrellis did not possess its stated capabilities and years of additional work would have been required for Centrellis to ever reach that point.

11.    The truth regarding the Individual Defendants' repeated misrepresentations was revealed on August 15, 2022, when, after the market closed, the Company announced significant changes to its core research and development ("R&D") strategy and its overall approach, effectively admitting that, contrary to the Individual Defendants' prior representations to stockholders, Centrellis lacked the capabilities to leverage any of the human health data it had obtained from its health system partnerships and the Company had a long way to go to make Centrellis a product.

12.    It was further disclosed on August 15, 2022, that defendant Eric Schadt ("Schadt"), whose primary focus at the Company had been the Centrellis project, was stepping down from his roles as President and Chief R&D Officer. It was also disclosed that approximately 250 employees would be eliminated, bringing the percentage of legacy Sema4 employees that had been eliminated up to that point in 2022 to about 30%. However, as part of the Company's new "R&D evolution", it was announced that a Chief Technology and Product Officer and a Chief

Sciences Officer had been appointed, and that these two new officers would be focused on "development of commercial products, [and] utilizing the data developed and curated on the Centrellis platform."

13.     On this news, the Company's stock price fell by $0.80, or *33.3%*, to close at $1.60 per share on August 16, 2022.

14.     Based on these events, the Securities Action was initiated on behalf of investors in the United States District Court for the District of Connecticut against the Company and certain of the Individual Defendants, including defendants Schadt, Katherine Stueland ("Stueland"), Isaac Ro ("Ro"), and Richard Miao ("Miao"). The operative Securities Complaint, filed on September 13, 2024, is based in part on detailed accounts provided by the three FEs.

15.     As discussed further herein, on June 23, 2025, class action claims for violations of the federal securities laws were sustained by the court in the Securities Action against the Company and defendants Schadt, Stueland, Ro, and Miao, notwithstanding the materially heightened pleading standards applicable to the Securities Action pursuant to the Private Securities Litigation Reform Act of 1995, as amended (the "PSLRA").

16.     Accordingly, the Company and each of the individual defendants in the Securities Action (Defendants Schadt, Stueland, Ro, and Miao) are now facing claims sustained against them under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), as the Securities Action proceeds towards trial.

17.     As alleged herein, under Delaware law, there is reason to doubt that a majority of the members of the Company's current Board could disinterestedly and/or independently respond to a pre-suit litigation demand. As a result, this derivative action brought against the Individual Defendants for the benefit of the Company should proceed.

## II.    JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

25.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

27.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

28.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because nominal defendant GeneDX is incorporated in this District and conducts business in this District.

## III.    PARTIES

### Plaintiff

29.    Plaintiff is a current holder of GeneDX common stock and has continuously held the Company's stock since April 2021.

### Nominal Defendant

30.    Nominal defendant GeneDX (formerly known as Sema4 Holdings Corp.) is a Delaware corporation with its corporate headquarters located in Stamford, Connecticut.

### The Individual Defendants

31.    Defendant Jason Ryan ("Ryan") joined Sema4's Board in July 2021 and served as the Company's Executive Chair from January 2022 until February 2024. According to the Company's public

filings, in connection with his role as Executive Chair, defendant Ryan was compensated as an executive officer pursuant to an employment agreement. Since the Company was renamed GeneDX, defendant Ryan has continued to serve as Chairman of the Board. According to the Company's own public filings with the SEC, including its most recent annual proxy statement dated April 30, 2025, the Board has admitted that defendant Ryan is a non-independent director of GeneDX.

32.      Defendant Stueland was appointed to serve as President and Chief Executive Officer ("CEO") of GeneDX in June 2021 and has served as the Company's CEO and as a Board member since April 2022. According to the Company's own public filings with the SEC, including its most recent annual proxy statement dated April 30, 2025, the Board has admitted that defendant Stueland is a non-independent director of GeneDX. Further, defendant Stueland is a named individual defendant in the Securities Action, and in connection therewith has had Exchange Act claims sustained against her.

33.      Defendant Eli D. Casdin ("Casdin") has served as a member of the Board since July 2020.

34.      Defendant Emily Leproust ("Leproust") has served as a member of the Board since September 2020. In addition, defendant Leproust has served as a member of the Board's Audit Committee (the "Audit Committee").

35.      Defendant Keith Meister ("Meister") has served as a member of the Board since January 2022. In addition, defendant Meister has served as Chair of the Audit Committee.

36.      Defendant Richard C. Pfennenger, Jr. ("Pfennenger") has served as a member of the Board since April 2022. In addition, defendant Pfennenger has served as a member of the Audit Committee.

37.    Defendant Joshua Ruch ("Ruch") joined the Sema4 Board in November 2017 and has served as a member of the Company's Board since July 2021. Defendant Ruch also formerly served as Chairman of the Board from July 2021 until January 2022.

38.    Defendant Rachel Sherman ("Sherman") served as a member of the Board from March 2020 until June 2023.

39.    Defendant Nat Turner ("Turner") served as a member of the Board from July 2021 until April 2022.

40.    Defendant Dennis Charney ("Charney") served as a member of the Board from June 2017 until June 2023.

41.    Defendant Michael Pellini ("Pellini") served as a member of the Board from August 2019 until February 2023.

42.    Defendant Schadt founded Sema4 and served as its CEO and a Board member until May 2022. From May 2022 until his resignation in August 2022, defendant Schadt served as President and Chief R&D Officer of the Company and additionally served as a Board member. Defendant Schadt is a named individual defendant in the Securities Action, and in connection therewith has had Exchange Act claims sustained against him.

43.    Defendant Ro served as Sema4's Chief Financial Officer ("CFO") from July 2021 until June 14, 2022, when it was announced that defendant Ro would be leaving the Company effective August 9, 2022, and would thereafter provide consulting services to the Company for six months. Defendant Ro is a named individual defendant in the Securities Action, and in connection therewith has had Exchange Act claims sustained against him.

44.    Defendant Miao served as the Company's Interim CFO from June 14, 2022. until September 2, 2022, when he departed the Company. Defendant Miao is a named individual

defendant in the Securities Action, and in connection therewith has had Exchange Act claims sustained against him.

45.     Defendants Ryan, Stueland, Casdin, Leproust, Meister, Pfennenger, Ruch, Sherman, Turner, Charney, Pellini, Schadt, Ro, and Miao are referred to collectively herein as the "Individual Defendants."

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES

46.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

48.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

49.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a)   manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws, rules, and regulations;

b)   neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules, and regulations;

c)   establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d)   neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business,

g)   to avoid wasting the Company's assets, and to maximize the value of the Company and the Company's stock;

h) ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

i) remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

50.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants.

51.     The Company's Code of Business Conduct and Ethics (the "Code") explicitly applies to all officers of the Company and all Board members.  Among other things, pursuant to the Code, the Individual Defendants were, and are, required at all times to: (1) comply with the law; (2) act responsibly and exercise sound judgment with respect to financial reporting; and (3) help ensure that the Company's public reports are complete, fair, and accurate.

52.     Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are required to assist the Board in fulfilling its oversight responsibilities relating to, among other things, GeneDX's accounting and financial reporting processes and internal controls, and compliance by GeneDX with legal and regulatory requirements.

53.     The Audit Committee Charter also specifically provides that the Audit Committee members have the following duties, among others: (1) reviewing, and discussing with management and the Independent Auditors prior to distribution to the public, GeneDx's quarterly and annual financial results, earnings press releases and other public announcements regarding GeneDx's operating results; (2) reviewing and discussing with GeneDx's management and the Independent Auditors, and providing oversight over, the design, implementation, adequacy and effectiveness of GeneDx's accounting and financial processes, and systems of internal controls and material changes in such controls, including any significant deficiencies and material weaknesses in their design or operation; (3) reviewing with management GeneDx's major financial risks and enterprise exposures and the steps management has taken to monitor or mitigate such risks and exposures, including GeneDx's procedures and any related policies with respect to risk assessment and risk management; and (4) reviewing with management GeneDx's (a) programs for promoting and monitoring compliance with applicable legal and regulatory requirements, and (b) major legal and regulatory compliance risk exposures and the steps management has taken to monitor or mitigate such exposures.

## V.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.     Sema4's Business

54.     Sema4 was founded by defendant Schadt as part of the Icahn School of Medicine at Mount Sinai's Department of Genetics and Genomic Sciences and the Icahn Institute for

Genomics and Multiscale Biology. Sema4 was established out of the Mount Sinai Health System and commenced operations in June 2017 as a commercial entity. The Company debuted on the NASDAQ Stock Market as a publicly traded company after completing a business combination with CM Life Sciences, a special purpose acquisition company, in July 2021.

55.     Sema4 is primarily a diagnostic testing company, which, during the Relevant Period, derived the majority of its revenue from its women's health and oncology diagnostic solutions. During the Relevant Period, Sema4 sought to expand its business beyond diagnostic testing and turned its focus to building and commercializing its health intelligence platform called Centrellis.

56.     During the Relevant Period, the Individual Defendants touted Centrellis as comprised of "a sophisticated data management and analytics engine" that had the capabilities to "transform the disease diagnosis and treatment paradigm for the entire healthcare ecosystem: patients, physicians, health systems, payers, and Biopharma companies."

57.     The Individual Defendants claimed that Centrellis was comprised of a data management backend that supported a wide array of databases, data warehouses, and knowledge bases, a data analytics layer to mine the data and construct predictive models that purportedly provided differentiated insights, and a series of application programmable interfaces to enable tool and software applications to access the data and models.

58.     According to the Individual Defendants, in the data management layer, Centrellis processed and stored data in a highly structured and accessible way, which was then analyzed by an advanced insights engine in the analytics layer that deployed state-of-the-art AI, probabilistic causal reasoning and machine learning approaches, and complementary analytics capabilities to

deliver accurate insights to patients, providers, and researchers across a broad range of applications.

59.    The Individual Defendants touted the Company's database as the "most comprehensive" and "fastest growing" in the industry, which was comprised of approximately 12 million de-identified clinical records, including more than 500,000 with genomic profiles, which the Company had obtained through its health systems partnerships. The Individual Defendants claimed that the health data was integrated in a way that enabled Centrellis to draw from the data and generate information that could be used by physicians to proactively diagnose and manage disease.

60.    The Individual Defendants maintained that Centrellis was designed to transform treatment decisions across multiple therapeutic areas by engaging large-scale, high-dimensional data and querying the predictive models of disease and wellness using patient-specific data to derive highly personalized, clinically actionable insights. The Individual Defendants asserted that Centrellis supported various applications, such as delivery of personalized and actionable treatment insights into clinical reports, clinical trial matching, real-world evidence trials and clinical decision support, through an advanced programmable interface, or API, layer.

61.    Since its inception, the Company has racked up significant net losses. For example, as of December 31, 2021, the Company had an accumulated deficit of about $575.4 million. Expanding its strategic partnerships was crucial to the Company's growth. Thus, stockholders reacted favorably to the announcement at the start of the Relevant Period on January 18, 2022, that Sema4 would be acquiring GeneDx, a provider of rare disease diagnostic and exome sequencing services, in a $623 million acquisition.

62.     The Individual Defendants claimed that combining Centrellis with GeneDx's services would allow Sema4 to become one of the largest genomic screening providers in the U.S. and would allow it to greatly increase revenues to $350 million in 2022 for the combined companies. The acquisition agreement required, among other things, that Sema4 would pay consideration of $150 million in cash at closing and 80 million shares of Sema4's Class A common stock to be issued at closing. On May 2, 2022, the closing of the acquisition of GeneDx was announced.

**B.     The Individual Defendants Tout Centrellis Throughout the Relevant Period**

63.     Throughout the entirety of the Relevant Period, the Individual Defendants touted the capabilities and prospects of Centrellis to stockholders. For example, at the start of the Relevant Period on January 18, 2022, the Individual Defendants, in announcing that Sema4 had reached an agreement to acquire GeneDx, stated:

> The acquisition strengthens Sema4's leadership, growth, and scale for its market-leading health intelligence and genomic screening offerings. Together, Sema4 and GeneDx will be one of the largest and most advanced providers of genomic clinical testing in the U.S., with a projected $350 million in pro forma 2022 revenue.

> Following completion of the acquisition, Sema4 will be optimally positioned to partner with health systems and biopharma companies to further transform the standard of care throughout the patient health journey. ***GeneDx's leadership in rare disease diagnostic and exome sequencing services brings more than 300,000 clinical exomes and over 2.1 million expertly annotated phenotypes to strengthen Sema4's 12 million de-identified clinical records for Centrellis®, its proprietary health intelligence platform[.] Sema4 plans to leverage this combined health information database to transform patient care and therapeutic development and enable precision medicine for all***.

64.     In a March 14, 2022, Company press release, the Individual Defendants similarly touted the Company's Centrellis platform and the pending GeneDx acquisition. Specifically, the Individual Defendants stated:

> ***Combining GeneDx's clinical genomic solutions with our core women's health business allows us to better serve health system and pharmaceutical and biotech***

*partners in a more holistic way. This transaction will significantly enhance the power of our Centrellis database by adding more than 2.1 million expertly curated phenotypes and well over 300,000 clinical exomes that GeneDx has generated to date.* Following the close of the acquisition, Sema4 will have the most comprehensive clinically relevant data set available for our research and development purposes.

65.    On May 2, 2022, the Individual Defendants announced in a press release the closing of the GeneDx acquisition and that GeneDx's CEO, defendant Stueland, and defendant Schadt would serve as co-CEOs of the Company. The Individual Defendants stated that in connection with the transition, defendant Schadt would focus on growing the Company's data business, *i.e.*, Centrellis. In connection with the acquisition, the Company had successfully completed a $200 million private placement offering, in which Pfizer Inc. ("Pfizer") participated.

66.    At a healthcare conference on June 16, 2022, defendant Stueland further touted the Centrellis platform, stating:

> *[W]hen you think about the data engine, Centrellis, that [Schadt] and the team have expertly built. That is an incredible combination of just being able to put a data engine that will be able to deliver improved and personalized health insights with our exome and genome as a backbone. That really enables something that is very different from any other company in this space.*

### C.    The Risks of the Individual Defendants' Scheme Materialize in August 2022

67.    On August 15, 2022, after the market closed, the Individual Defendants announced significant changes to the Company's business model, R&D strategy, and R&D leadership team. The Individual Defendants effectively admitted that, contrary to their Relevant Period representations to stockholders, they had failed to utilize and leverage human health data via Centrellis and thus lacked the capabilities the Individual Defendants had represented that it possessed. The Individual Defendants further effectively admitted that they had lacked a product strategy and that the Company's focus on increasing health system partnerships and accumulating

vast amounts of human health data had not gotten the Company any closer to creating Centrellis.

Specifically, the Individual Defendants stated on a public conference call that day:

> ***Our new management team has been reviewing our business lines and is acutely focused on assessing what's working and what's not. And as a result, we're making changes to ensure we strengthen our foundation and financials, so we can continue to realize our mission of unlocking insights from data, leading to healthier lives and in doing so, realizing value for our shareholders***. What remains the same is our vision to deliver personalized health and wellness plans for patients based on comprehensive data. How we realize that vision will be very different by virtue of strategy, execution and how we show up in the world....As I said earlier, our mission of delivering health insights from data remain strong, albeit with an evolution of that strategy .... ***We're shifting from an academic spin-off strategy for R&D to a scalable one. Data insights will continue to be the way that we design our products roadmap, but we need to start by having a deliberate and clear strategy that puts an equal premium on scale as it does on innovation. This is true for how we're working with health systems as well as how we're going to productize our pharma offering. Our comprehensive data assets, including longitudinal clinical data, in addition to one of the world's largest data sets of approximately 400,000 clinical exomes, the vast majority of which are associated with rare disease, provides Sema4 an unparallel platform for pharma to leverage***.

68.    In addition, during that same August 15, 2022 conference call, defendant Stueland stated:

> [W]hat we are doing is taking a look at the existing health systems that we're working with. I think historically, they've been characterized as learning partnerships. ***And what we're doing is working with them to figure out exactly how to ensure we can scale before we add additional health partnerships***. So right now, each one has a unique focus. One is focused on hereditary cancer screening. Another is focused more on healthy mom and healthy baby. And that gives us an opportunity to be able to bring to our health system, the GeneDx suite of products in the pediatric setting. ***So we've actually hired somebody to join the team to be able to work with our new R&D leads to really build that road map to scale health systems before we continue to invest in yet another learning system. And so that is what our plan is***. Once we have an approach to being able to scale them, I think we'll be able to provide a better insight in terms of how we might be able to go to market to bring more online.... ***But we have a lot of work to do to really pull those through and realize them into partnerships that will be gross margin positive. And again, what we want to do is spend some time figuring out how to productize that. So we can actually go to health systems with a very clear suite of services that we can provide to them rather than approaching each one as kind of a unique go-to-market approach.***

69.     It was also announced on August 15, 2022, that defendant Schadt was resigning from the Company and that the Company was eliminating about 250 employees, bringing the percentage of legacy Sema4 workers that had been laid off since the start of the Relevant Period to about 30%. It was further disclosed that the Company had also hired two new R&D officers:

> To lead our R&D evolution to a new chapter of innovation and scale, we are pleased to welcome Matt Davis, former Head of AI at Invitae, who is joining us as Chief Technology and Product Officer. Together with Gustavo Stolovitzky leading our research and data sciences effort, *we will continue to invest in the development of commercial products, utilizing the data developed and curated on the Centrellis platform*.

70.     On this news, the Company's stock price plummeted by $0.80, or *33.3%*, to close at $1.60 per share on August 16, 2022.

**D.     The Risks of the Individual Defendants' Scheme Continue to Materialize Well After August 2022**

71.     On November 14, 2022, to the surprise of stockholders, the Individual Defendants announced the elimination of the Company's core business -- its reproductive health testing market -- by year-end 2022, along with its somatic oncology testing operations, as these segments had been losing about $35 million per quarter and faced multiple challenges in terms of reimbursement, lack of scale and competition. In connection with the elimination of the reproductive health testing segment, the Individual Defendants stated they would close the Company's Stamford, Connecticut lab. The Individual Defendants stated that they had hired an advisor to find a buyer for the Company's reproductive health testing segment, but such efforts were unsuccessful. The Individual Defendants stated that going forward, the Company's business would focus on GeneDx's more differentiated exome and genome testing focused on pediatric and rare disease markets. The Individual Defendants also announced yet another workforce reduction of about 500 employees (or 1/3 of the Company's workforce).

72.     On January 9, 2023, the Company issued a press release which provided its preliminary 2022 financial results and 2023 guidance. In the press release, the Company stated that revenues would be between $170-173 million for 2022 – a far cry from the Individual Defendants' projection at the start of the Relevant Period that the Company would deliver $350 million in 2022 revenue. The Company projected 2023 revenues of $205-$220 million and stated that it expected to turn profitable in 2025.

73.     On January 10, 2023, the *CT Insider* published an article entitled "Embattled CT company Sema4 announces name change as it cuts jobs," which reported the following:

STAMFORD — ***Genomic testing company Sema4, which recently announced plans to cut several hundred jobs and close its laboratories in Connecticut, announced Monday the change of its name to GeneDx, the Maryland-based genomic testing provider that it acquired last year***.

The new name is the latest sign of the far-reaching impact of the acquisition of GeneDx, whose chief executive officer, Katherine Stueland, is now the combined companies' CEO and president.

Since its spin-off in 2017 from the Mount Sinai Health System, Sema4 had gone by that name, which refers to semaphore, a system used to send signals. In previous statements, the company has said it aimed to "discern signal from noise across trillions of data points" to gain insights into human health.

"For more than 20 years, GeneDx has earned the constant trust of the world's genetics experts, while pioneering and increasing the use of its clinically actionable exome and genome analysis," Stueland said in a statement. "By combining the best of GeneDx and Sema4 to continue our growth, we sit at the intersection of diagnostics and data science, pairing decades of genomic interpretation expertise with an unmatched ability to analyze clinical data at scale. GeneDx now has the capability to combine the power of genomic insights with clinical data to improve health care for people and populations."

The name change does not indicate, however, any plans by the company to move its headquarters to Gaithersburg, Md., the home city of GeneDx. In response to an inquiry from Hearst Connecticut Media Group, a Sema4 spokesperson said Monday that the main offices would remain at 333 Ludlow St., in the South End of Stamford.

*But the lab shutdowns in Connecticut are proceeding. The facilities at 1 Commercial St., in Branford, and 62 Southfield Ave., in Stamford, are scheduled to close by the end of the first quarter of this year, according to the spokesperson. Those shutdowns, which were announced last year, reflect the company's exit from testing for reproductive health and somatic tumors. A facility in Gaithersburg will serve as the company's primary lab*.

As a result of the restructuring, the company also announced last year two rounds of layoffs, affecting a total about 700 employees — with those positions largely based in Connecticut. The company now has about 1,100 employees.

Alongside the name change, GeneDx's shares of Class A common stock will trade under a new ticker symbol, "WGS," which recognizes the company's role in "pioneering" whole genome sequencing. The company expects its shares of Class A common stock to start trading Tuesday on the NASDAQ Stock Market under the new name and ticker symbol.

Also Monday, the company disclosed preliminary results for the past year and some projections about its performance. It expects its "pro forma" 2022 revenues to increase about 37 to 40 percent year over year, to between $170 million and $173 million. Those numbers exclude returns from reproductive health and somatic tumor testing.

The company expects further revenue growth in 2023, while it aims to turn profitable in 2025. For the first nine months of 2022, it sustained a loss of about $240 million.

Following Monday's announcements, the company's shares closed for the day at $0.31, a 27 percent jump from last Friday. *But its share price has declined precipitously in recent months, as it was worth about 15 times its current value at this point a year ago*.

*As a result of the plunge, the company was informed on Dec. 28 by Nasdaq that, based on the closing bid price of its Class A common stock for the past 30 trading days, it no longer complied with the required minimum bid price of $1 per share for continued listing on the Global Select Market*.

## VI.    THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE RELEVANT PERIOD

### A.    January 18, 2022 Statements

74.    On January 18, 2022, the Individual Defendants caused Sema4 to announce in a press release titled "Sema4 to Acquire GeneDx, Strengthening its Market-Leading AI-Driven Genomic and Clinical Data Platform", that it had reached a deal to acquire GeneDx, a company

focused on rare disease diagnostic and exome sequencing services. The Individual Defendants touted the business combination in the press release as follows:

> The acquisition strengthens Sema4's leadership, growth, and scale for its market-leading health intelligence and genomic screening offerings. Together, Sema4 and GeneDx will be one of the largest and most advanced providers of genomic clinical testing in the U.S., with a projected $350 million in pro forma 2022 revenue.
>
> Following completion of the acquisition, Sema4 will be optimally positioned to partner with health systems and biopharma companies to further transform the standard of care throughout the patient health journey. ***GeneDx's leadership in rare disease diagnostic and exome sequencing services brings more than 300,000 clinical exomes and over 2.1 million expertly annotated phenotypes to strengthen Sema4's 12 million de-identified clinical records for Centrellis®, its proprietary health intelligence platform[.] Sema4 plans to leverage this combined health information database to transform patient care and therapeutic development and enable precision medicine for all***.
>
> "This acquisition gives us the opportunity to accelerate the use of genomics as standard of care by providing a deeper menu of precision medicine solutions to our health system partners to better meet their clinical needs," said Eric Schadt, PhD, Founder and CEO of Sema4. "Adding GeneDx's comprehensive dataset and capabilities to our offerings enables us to inform on an even broader range of diseases, further closing the gap between the practice of medicine and the availability of more clinically actionable guidance. GeneDx's operational prowess and market-leading cost structure in exome and genome sequencing will also help accelerate our path to improved gross margins and profitability."

75.     On January 18, 2022, the Individual Defendants also held a public conference call with stockholders and analysts. On that call, the Individual Defendants further touted the GeneDx acquisition, stating:

> ***No other company will have the deep expertise in next-generation sequencing, rigorous science underpinning our clinical offerings and advanced capabilities to put these disciplines together with data-driven insights. The transaction will significantly enhance the power of our market-leading Centrellis database by adding more than 2.1 million expertly curated phenotypes and over 300,000 clinical exomes GeneDx has generated to date. The largest such effort of its kind in the clinical arena and growing.***

76.     During the January 18, 2022 conference call, defendant Schadt further stated:

On being able to pull the type of data GeneDx generates and aggregates around patients, what I'll say is *our whole history has been -- our whole play with different health systems in acquiring patient data and partnership with patients outside of the health systems has been how to take -- how to consume those different kinds of data, how to abstract from unstructured data, how to restructure those data, how to map those in a common data model so that they're comparable and can be integrated into 1 central database repository of the Centrellis platform and kind of seamlessly queried without having to worry about where they came from. That same technology that we've developed for those interactions will deploy into the GeneDx arena.* So we don't see anything that would hold us back from being able to rapidly consume everything that GeneDx has assembled and continues to assemble today.

**B.**    **March 14, 2022 Statements**

77.    On March 14, 2022, the Individual Defendants caused Sema4 to announce its

fourth quarter and full year 2021 financial results in a press release which stated, in relevant part:

STAMFORD, CT — March 14, 2022 —Sema4 Holdings Corp. (Nasdaq: SMFR) ("Sema4"), an AI-driven genomic and clinical data intelligence platform company, today reported its financial results for the fourth quarter and full year ended December 31, 2021 and provided an update on key strategic and operational initiatives.

"2021 was a transformative year during which we grew our test volumes and patient database, further established Sema4 as a partner of choice for health systems, advanced our strategic objectives to accelerate the growth of our platform of algorithms, and listed on Nasdaq as a public company," said Eric Schadt, PhD, Founder and Chief Executive Officer of Sema4. "We are well positioned for 2022 and are excited to see the investments in our key initiatives begin to scale our core business and further grow our data engine. *We also continue to expect to close the acquisition of GeneDx by the end of Q2, which will significantly enhance the power of our Centrellis® platform and distance us as the market leader with the most comprehensive clinically relevant data set available for research and development purposes.*"

"I am pleased with our results in the quarter, and as we look ahead to 2022, I am encouraged by the trajectory of volumes and gross margins," said Isaac Ro, Chief Financial Officer of Sema4. "Investments in automation, people, and processes are now translating into tangible efficiencies. We expect gross margins to further improve throughout 2022."

**Fourth Quarter & Recent Highlights**

•　　　Diagnostic testing volumes were up 37% in the fourth quarter of 2021 compared to the same period of 2020, with 82,966 tests resulted (excluding COVID-19 tests), including 142% growth in Oncology and 33% growth in Women's Health

•　　　Total revenue increased 24% in the fourth quarter of 2021 (excluding COVID-19 testing revenue) compared to the same period of 2020, resulting in total revenue of $47.3 million compared to $38.2 million

•　　　Published two papers in November 2021 in partnership with the Mount Sinai Health System demonstrating the ability of Sema4's machine learning algorithms to predict clinical outcomes and drive meaningful changes in the standard of care for postpartum hemorrhage

•　　　***Announced the signing of a definitive agreement to acquire GeneDx, Inc. ("GeneDx") in January 2022, which is expected to strengthen Centrellis with more than 300,000 clinical exomes and over 2.1 million expertly annotated phenotypes***

•　　　Entered into definitive agreements for a $200 million private placement financing from leading growth and life sciences investors, including Pfizer, in January 2022 in conjunction with the signing of the merger agreement for the pending GeneDx acquisition

•　　　Strengthened Market Access Team in February 2022 with the addition of 30-year industry veteran, Jerry Conway, Sema4's SVP of Market Access

•　　　Included in Fast Company's prestigious annual list of the World's Most Innovative Companies in March 2022; named as one of the top three most innovative data science companies

**Full Year 2021 Business Highlights**

•　　　Signed three new health system partnerships with NorthShore University HealthSystem, AdventHealth, and Avera Health, launching broad precision medicine initiatives to improve health outcomes

•　　　Further developed our clinical trial and testing solutions, real world evidence studies, and casual network models for drug discovery in oncology, autoimmune and rare diseases, while also launching new transformative partnerships focused on creating significant value for pharmaceutical and biotech companies

•　　　Launched Sema4 Elements®, our portfolio of data science-driven products and services to support reproductive and generational health, including a

newly enhanced version of Sema4's Expanded Carrier Screen for pregnancy planning

•      Debuted on the Nasdaq Stock Market as a publicly traded company after completing a business combination with CM Life Sciences (Nasdaq: CMLF), a special purpose acquisition company (SPAC) sponsored by affiliates of Casdin Capital, LLC and Corvex Management LP

78.      Also on March 14, 2022, the Individual Defendants held a conference call with stockholders and analysts to discuss the Company's fourth quarter and full year 2021 financial results. During the call, the Individual Defendants touted Centrellis as follows:

> ***We believe that Centrellis is the most extensive and fastest-growing database of clinically relevant patient data in the industry***. Meanwhile, our next-gen sequencing capacity continues to expand, where we are expecting to grow genomic patient records more than 50% in 2022 over 2021.

> ***

> We are excited to partner with Katherine Stueland, CEO of GeneDx and the team from GeneDx, who share our vision of leveraging genomics in large-scale clinical and multiomic data to enhance the standard of care through precision medicine in partnership with patients and providers. ***Combining GeneDx's clinical genomic solutions with our core women's health business allows us to better serve health system and pharmaceutical and biotech partners in a more holistic way. This transaction will significantly enhance the power of our Centrellis database by adding more than 2.1 million expertly curated phenotypes and well over 300,000 clinical exomes that GeneDx has generated to date. Following the close of the acquisition, Sema4 will have the most comprehensive clinically relevant data set available for our research and development purposes.***

> ***

> We are pleased to have recently announced our partnership with BioSymetrics focusing on data driven drug discovery to advance precision medicine. ***Together, we will leverage our proprietary health intelligence platform, Centrellis, in combination with Elion, BioSymetrics' phenotypic drug discovery platform to both experimentally validate our AI-based disease and risk models and to discover new treatments initially in cardiovascular, rare and neurological diseases***.

> ***

MAX MASUCCI, SENIOR ANALYST, COWEN AND COMPANY, LLC, RESEARCH DIVISION: I would just be curious to start, was the deal with Biosymetrics driven more by Sema4's core capabilities with Centrellis? Or did GeneDx's whole exome database play a factor?

ERIC E. SCHADT: *Yes, driven initially completely by the Centrellis platform, engaging a partner with significant high-content screening type capabilities, the ability to experimentally validate across a broad array of experimental systems, the kinds of predictions we make and the complex models we put together for disease.*

*So helping validate and progress those models for better actionability, whether it's in clinical test, the clinical genomic testing or in the drug discovery partnerships we have with pharmaceutical companies, but then also better leveraging from our information assets to progress targets on our own in partnership with Biosymetrics.*

The add of GeneDx into the mix just kind of accelerates in my view, the utility of that platform, especially in the rare disorder arena where the scales of data GeneDx brings to the table and the breadth of their testing across all of the children's hospitals and kind of that rare disorder space kind of gives us definitely a strategic advantage in kind of from identifying and prioritizing targets that we may progress to finding the right patient populations to further assess those models.

79.     On March 14, 2022, the Individual Defendants caused the Company to file its Annual Report on Form 10-K with the SEC, reporting the Company's financial results for the year ended December 31, 2021 (the "2021 10-K"). The Individual Defendants made the following claims to stockholders in the 2021 10-K:

By combining our data-driven approach and our deep understanding of health system workflows, we have developed a holistic health information platform, Centrellis, to transform the disease diagnosis and treatment paradigm for the entire healthcare ecosystem: patients, physicians, health systems, payers, and Biopharma companies. *The Centrellis platform is comprised of a data management backend that supports a wide array of databases, data warehouses, and knowledge bases, a data analytics layer to mine the data and construct predictive models that provide differentiated insights, and a series of application programmable interfaces to enable tool and software applications to access the data and models.* Centrellis serves as the underlying foundation of our precision medicine solution and *comprises a sophisticated data management and analytics engine.*

In the data management layer, *our platform processes and stores data in a highly structured and accessible way, which is then analyzed by an advanced insights*

*engine in the analytics layer that deploys state-of-the- art AI, probabilistic causal reasoning and machine learning approaches, and complementary analytics capabilities to deliver increasingly accurate insights to patients, providers, and researchers across a broad range of applications.*

*Centrellis is designed to transform treatment decisions across multiple therapeutic areas by engaging large-scale, high-dimensional data and querying the predictive models of disease and wellness using patient-specific data to derive highly personalized, clinically actionable insights.* Centrellis supports various applications, such as delivery of personalized and actionable treatment insights into clinical reports, clinical trial matching, real-world evidence trials and clinical decision support, through an advanced programmable interface, or API, layer.

## Centrellis: Our Health Information Platform Solution

*By combining our data-driven approach and our deep understanding of health system workflows, we have developed a holistic health information platform, Centrellis, to transform the disease diagnosis and treatment paradigm for the entire healthcare ecosystem: patients, physicians, health systems, payers, and Biopharma companies.* Centrellis is the culmination of our critical competencies and goals as a company:

- technologies aimed at patient and provider engagement,

- the generation, aggregation and standardization of multi-dimensional data, and

- the modeling and generation of differentiated, domain-specific insights

Driven by the virtuous cycle and interconnection of our clinical diagnostics products, rich data assets, database engineering and data science applications, *we continue to evolve and deploy our platform to facilitate a better understanding of disease and wellness and improve the standard of care through information driven knowledge and understanding.*

*Provider Engagement Technologies: Our Next Generation Tools*

*We have built comprehensive solutions in Centrellis that enable clinicians, researchers, and patients to engage with the relevant structured health data and to leverage our predictive models of disease and wellness and produce clinically actionable insights.*

*For clinicians and researchers, we have designed Centrellis's adaptive learning capabilities and tools to enable health systems and clinicians to manage their patient care, research, and health data in one place and to adapt to rapidly changing scientific and clinical norms through an advanced programmable interface, or API, layer*, including:

• Integration and on-boarding for health systems and practices that connects data from EMRs and disparate and varied databases,

• Searching and analyzing cohorts of patients, allowing an assessment of their patient populations and quality of care in real-time,

• Enabling clinical decision support and personalized and actionable treatment insights into clinical reports,

• Identifying patients who are candidates for certain clinical genomic analyses,

• Managing the clinical analysis ordered for their patients, from ordering, tracking, resulting, and reanalyzing based on new findings,

• Supporting clinical care and research by matching patients to available clinical trials based on highly personalized inclusion and exclusion metrics, and

• Informing on administrative decisions including as they relate to patient growth, total cost of care, and risk identification and mitigation.

***

*Activating Data Through Generation, Curation and Engineering*

*We designed Centrellis to create an accessible and usable database that can support interpretation consistently across patient populations represented within the broad healthcare ecosystem. Centrellis aggregates large-scale and diverse data, abstract and structure informative unstructured data, and finally integrate the data into an accessible, web-scalable data warehouse that employs a common data model across a broad series of databases.*

*Unstructured data derived from EMR and associated data are run through multiple pipelines leveraging machine learning-enabled natural language processing, augmented as needed by human annotators, to extract information and knowledge from that data and then structure and implement extensive quality assurance processes for the resulting annotations.* Our multiscale, integrative strategy allows us to connect the processed EMR data with complex biological data from many sources, such as the genome, proteome, transcriptome, epigenome, and microbiome. Our standardization of the genomic and EMR data also allows us to pursue strategic relationships in the Biopharma industry, connecting Biopharma companies with clinicians and researchers to create computational models of disease, discover and validate targets and biomarkers, help design clinical trials and recruit patients, and support the collection of real-world data and evidence.

80.    The 2021 10-K was signed by defendants Schadt, Ro, Ryan, Casdin, Charney, Leproust, Meister, Pellini, Ruch, Sherman, and Turner. Notably, defendants Ryan, Casdin, Leproust, Meister, and Ruch constitute a majority (5 out of 7) of the current members of the Board.

81.    The Individual Defendants' public statements to stockholders set forth above on January 18, 2022 and March 14, 2022 -- including statements in the 2021 10-K signed by a majority of the current Board members -- were materially false and/or misleading because they misrepresented or failed to disclose that, *inter alia*, (a) the Individual Defendants represented that the Company had developed an AI-driven platform called Centrellis so that they could tout the Company as a data company rather than just a diagnostics company to increase the Company's valuation; (b) Centrellis was not, *inter alia*, "an accessible and usable database that [could] support interpretation consistently", and Centrellis did not "store[] data in a highly structured and accessible way, which is then analyzed by an advanced insights engine"; (c) indeed, Centrellis could not utilize, leverage, analyze, or use human health data in any meaningful way, and as such, was nonexistent; (d) the Company had years left of efforts and would need billions of additional dollars for Centrellis to realize its stated capabilities; (e) regulatory hurdles concerning patient consent were undermanaged and stymied the Centrellis project; (f) the Company had no product strategy for Centrellis; (g) the Company's focus on increasing health system partnerships and accumulating human health data did nothing to advance Centrellis's commercial viability; (h) a commercially viable platform would have a data set that was well curated, growing, and features which would allow users to access data and parse data – and the Company had achieved none of those things with Centrellis, and; (i) as a result of (a)-(h), the Individual Defendants had no reasonable basis for their projections

following the GeneDx acquisition, such as their projection that the Company would generate $350 million in revenue for 2022.

**C.    May 12, 2022 Statements**

82.    On May 12, 2022, the Individual Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q in connection with its financial results for the first quarter of 2022 (the "Q1 2022 10-Q"). The Q1 2022 10-Q purported to warn that:

> *We have limited experience with the development and commercialization of our databases and our health information and genomic platforms.*
>
> *We have limited experience with the development or commercialization of clinical or research products in connection with the databases we manage and to which we have access, including our Centrellis [] platform[].* Our partners' usage of an advanced machine learning engine for therapeutic decision-making are at an early stage of development and usage under current and proposed collaborations, and we are continuing to develop new processes that may support the development of new therapeutics applications such as the delivery of personalized clinically actionable insights into clinical reports, clinical trial matching, real-world evidence trials, and clinical decision support, via an advanced programmable interface layer. Although our partners have invested significant financial resources to develop and utilize new technologies to support preclinical studies and other early research and development activities, and provide general and administrative support for these operations, *our future success is dependent on our current and future partners' ability to successfully derive actionable insights from the database and our platform,* and our partners' ability, where applicable, to obtain regulatory approval for new therapeutic solutions based off existing models or to obtain regulatory approval and marketing for, and to successfully commercialize, new therapeutics. *The use of our platform and the databases it manages and to which it has access for these purposes will require additional regulatory investments for Centrellis, such as "good practice" quality guidelines and regulations ("GxP"), and data quality and integrity controls.*
>
> \*\*\*
>
> *We may not be able to manage our future growth effectively, which could make it difficult to execute our business strategy.*
>
> ....We plan to develop and launch new versions of our Centrellis [] platform[] and our core diagnostic products, which will affect a broad range of business processes and functional areas. The time and resources required to implement these new

systems is uncertain, and failure to complete these activities in a timely and efficient manner could adversely affect our operations.

\*\*\*

***We need to scale our infrastructure in advance of demand for our products and services, and our failure to generate sufficient demand for our products and services would have a negative impact on our business and our ability to attain profitability.***

Our success depends in large part on our ability to extend our market position, to provide customers with high-quality health reports and health information and data science services in a manner that differentiates us from our competitors, and to deploy technologies and achieve sufficient volumes to realize economies of scale. In order to execute our business model, we intend to continue to invest heavily in order to significantly scale our infrastructure, including our lab infrastructure and testing capacity and our information and computing systems, expand our commercial operations, customer service, billing and systems processes and enhance our internal quality assurance program. We will also need to enhance our capacity for data privacy management as we scale our infrastructure. We expect that much of this growth will be in advance of both demand for our products and services as well as our ability to diversify our offerings, including services related to Centrellis ... and the databases we manage and to which we have access, and our ability to find appropriate partners through collaborations and acquisitions.... ***Even if we are able to successfully scale our infrastructure and operations while successfully diversifying our offering, we cannot assure you that demand for our products and services, including our Centrellis platform, will increase at levels consistent with the growth of our infrastructure. If we fail to generate demand commensurate with this growth or if we fail to scale our infrastructure sufficiently in advance of demand to successfully meet such demand, our business, prospects, financial condition and results of operations could be adversely affected.***

83.    The foregoing statements in the Q1 2022 10-Q were materially false and/or misleading because the Individual Defendants couched such statements as "hypothetical" risks to the Company's business, but these risks were already materializing at the time of the Individual Defendants' so-called warnings. Further, the foregoing statements were materially false and/or misleading because the Individual Defendants misrepresented or failed to disclose that, *inter alia*, (a) Centrellis could not utilize, leverage, analyze, or use human health data in any meaningful way, and as such, was nonexistent; (b) the Company had five years or more left of hard work to do and

would need billions of additional dollars for Centrellis to realize its stated capabilities; (c) regulatory hurdles concerning patient consent were undermanaged and stymied the Centrellis project and the Company needed, but did not have, a regulatory department; (d) the Company had no product strategy for Centrellis; (e) the Company's focus on increasing health system partnerships and accumulating human health data was not advancing Centrellis's commercial viability, and; (f) the Company had achieved none of the aspects needed to create a commercially viable platform with Centrellis, including a data set that was well curated, growing, and features which would allow users to access data and parse data.

84.    On May 12, 2022, the Individual Defendants also held a conference call with stockholders and analysts to discuss the Company's first quarter 2022 financial results. During the conference call, defendant Schadt represented the following:

> We believe the rapid advances in genomics and AI, along with the exponentially growing oceans of molecular imaging and clinical data, could and should be integrated into an information platform able to deliver a broad array of insights that drive more efficient treatment decisions and therapeutic development.
>
> While there are many companies that seek to address various components of our solution, none have been able to wire these components together at scale and in a way that fully engages health systems as a health delivery partner. ***Our sophisticated platform draws on information from many sources: from advanced genomic testing solutions; to patient electronic medical records, including physician notes and other unstructured data; to hospital records and population health among many other large-scale sets of data available in the digital universe. With this platform, Sema4 enables patients and providers to derive differentiated insights in real time that can dramatically improve the standard of care.***

### D.    June 16, 2022 Statements

85.    On June 16, 2022, the Individual Defendants caused the Company to participate in the Goldman Sachs Global Healthcare Conference. During that conference, defendant Stueland represented the following:

GeneDx is bringing an incredible rare disease asset to bear, both in terms of our exome, our interpretation platform that is not only applicable to our exome, but to genome as well in addition to the rare disease dataset that we have.

***But then when you think about the data engine, Centrellis, that Eric and the team have expertly built. That is an incredible combination of just being able to put a data engine that will be able to deliver improved and personalized health insights with our exome and genome as a backbone. That really enables something that is very different from any other company in this space. And I think that that really sets the foundation for how we can work with health systems and pharma companies to deliver on the promise of personalized medicine.***

86.    Defendant Schadt's statements on the May 12, 2022 conference call and defendant Stueland's statements during the June 16, 2022 conference, as set forth above were materially false and/or misleading because they misrepresented or failed to disclose that, *inter alia*, (a) the Individual Defendants represented that the Company had developed an AI-driven platform called Centrellis so that they could tout the Company as a data company rather than just a diagnostics company to increase the Company's valuation; (b) Centrellis was not, *inter alia*, "an accessible and usable database that [could] support interpretation consistently", and Centrellis did not "store[] data in a highly structured and accessible way, which is then analyzed by an advanced insights engine"; (c) indeed, Centrellis could not utilize, leverage, analyze, or use human health data in any meaningful way, and as such, was nonexistent; (d) the Company had years left of efforts and would need billions of additional dollars for Centrellis to realize its stated capabilities; (e) regulatory hurdles concerning patient consent were undermanaged and stymied the Centrellis project; (f) the Company had no product strategy for Centrellis; (g) the Company's focus on increasing health system partnerships and accumulating human health data did nothing to advance Centrellis's commercial viability, and; (h) a commercially viable platform would have a data set that was well curated, growing, and features which would allow users to access data and parse data – and the Company had achieved none of those things with Centrellis.

## VII.    DETAILED FE ACCOUNTS IN THE SUSTAINED SECURITIES COMPLAINT

87.    According to the account in the Securities Action of FE 1, who is alleged in the Securities Complaint to have served as Senior Vice President, Production Bioinformatics at Sema4 from February 2020 through September 2022, FE 1 was responsible for all the data that came from the Company's clinical testing operations. Part of FE 1's job included prioritizing the asks of the R&D team and clinical team and deciding which got answered first. FE 1 also had access to a dashboard that included information about the Company's costs incurred to deliver services. When FE 1 joined the Company, FE 1 reported to the CIO, Anatol Blass. In late 2021, the Company hired a Chief Data Officer, Andrew Kasarskis, whom FE 1 then reported to instead. During FE 1's tenure, FE 1 had occasional contact with defendant Schadt and the Company's then-CFO, defendant Ro, and occasionally gave presentations at Company meetings where defendants Schadt and Ro were present.

88.    According to FE 1's account in the Securities Complaint, Centrellis never existed. By FE 1's account, the Individual Defendants represented that Sema4 had created an AI-driven platform called Centrellis so that Sema4 could tout itself as a data company rather than just a diagnostics company to increase the Company's valuation.

89.    The Securities Complaint alleges that FE 2 served as a Vice President of Business Development at the Company from May 2018 through September 2020, and then served as a Senior Vice President of Business Development at the Company from September 2020 through February 2023. FE 2 is alleged to have focused on trying to build Centrellis, and to have worked for and alongside defendant Schadt.

90.    Per the Securities Complaint, FE 2's focus was to find academic centers that would partner with the Company and provide the Company with patient data, with the goal that Sema4 would find ways to leverage that data through Centrellis. FE 2 worked closely with

defendant Schadt, engaging in a consistent daily dialog seven days a week for at least four years, putting together proposals and presentations for potential Centrellis partners and traveling the U.S. with defendant Schadt to deliver those proposals and presentations to physicians and health care providers; such meetings could take up to an entire day.

91.     FE 2's account in the Securities Complaint notes that defendant Schadt had voiced doubts about the Company's ability to make Centrellis a meaningful product before the Company's funding ran out. FE 2 described the Company as in a "mad race" to try to obtain Centrellis partnerships, hire as many skilled resources as possible, and build Centrellis so that it could use the data obtained through its partnerships, while at the same time, trying to raise enough cash to keep the Company going.

92.     FE 2 is alleged to have often interacted with defendants Ro and Miao during FE 2's tenure, and to have discussed Centrellis with both individuals. Per the Securities Complaint, most of FE 2's conversations with defendants Ro and Miao focused on trying to come up with ways to build relationships with health system partners and invest into those relationships without burning too many costs.

93.     According to FE 2's account, although the Company was able to obtain a substantial amount of human health data, ultimately, the data was unusable by Centrellis. Centrellis lacked the ability to utilize the data in a correct or appropriate way in accordance with its objectives. The Company was unable to secure any significant commercial client for Centrellis. FE 2 further noted that obtaining patient consent in a compliant manner was a hurdle to Centrellis's progress. FE 2 stated that the Company would have needed to continue raising billions of dollars and put "many years" of additional work in to achieve the Company's objectives for Centrellis.

FE 2 stated that ultimately, the Company wound down its efforts regarding Centrellis and FE 2 was laid off.

94.    The Securities Complaint alleges that FE 3 served as the Company's CIO from September 2021 through the entirety of the Relevant Period, until FE 3 left the Company in mid-2023. Per FE 3's account, FE 3 was responsible for the Company's information technology ("IT"), which included ensuring the Company had appropriate security, supporting teams, and appropriate platforms for its operations, as well as ensuring that the Company handled health data intended for use in Centrellis in a compliant manner.

95.    It was alleged that during FE 3's tenure, FE 3 participated in standing weekly calls with Sema4's high-ranking officers and executives, where Centrellis was regularly mentioned. For example, FE 3, along with defendant Schadt, Sema4's Chief Product Officer, Sema4's President, and Sema4's General Counsel, participated in a weekly standing call with Mt. Sinai, which had agreed to provide millions of patient records to the Company intended for use with Centrellis. FE 3 is alleged to have participated in a standing weekly call with the Company's C-suite, which defendant Schadt often joined, where broader planning and objectives were discussed. FE 3 participated in the Company's standing weekly product call, led by the Company's Chief Product Officer and Chief of Staff, which defendant Schadt also often joined. FE 3 was also part of day-to-day conversations involving Centrellis.

96.    Per FE 3 's account in the Securities Complaint, a commercially viable platform would have a data set that was well curated, growing, and which had features which would allow users to access data and parse data – and Sema4 had achieved none of those things with Centrellis. In other words, Centrellis could not do what the Individual Defendants represented it could do. FE 3 noted that Sema4 struggled to feed the health data it had obtained into a data set that would form

the basis of what Centrellis was intended to become, and that the Company experienced hiring difficulties and regulatory hurdles that further stymied the Centrellis project.

97.    According to the Securities Complaint, FE 3 noted that use of human health data is heavily regulated, and the Company was particularly immature on that front. Without patient consent and compliance with the relevant regulations concerning the same, Sema4 would not be able to utilize and leverage the human health data it had obtained from its health system partners. In other words, without patient consent, there would be no Centrellis. FE 3 felt issues concerning consent and compliance were undermanaged and were not paid sufficient attention, and noted that the Company should have had a regulatory department.

98.    In addition, FE 3 noted that there was no product strategy for Centrellis. FE 3 noted that some thought Centrellis should be designed to be generically useful, such that it was scalable but not customizable, while others thought it should be designed as a bespoke platform, tailored for each unique potential customer. This concerned FE 3, as in FE 3's view, a company cannot build teams appropriately without a product strategy.

99.    According to the Securities Complaint, FE 3 noted "discomfort" with Sema4's public statements about Centrellis, which in FE 3's view, made Centrellis sound much more advanced and polished than it actually was. For example, FE 3 believed that defendant Schadt's March 14, 2022 statements (set forth above) that the GeneDx business combination would "enhance the power of our Centrellis platform and distance us as the market leader with the most comprehensive clinically relevant data set available for research and development purposes" and defendant Stueland's statement on June 16, 2022 (set forth above) that "the data engine, Centrellis ... That is an incredible combination of just being able to put a data engine that will be able to deliver improved and personalized health insights with [GeneDx's] exome and genome as a

backbone. That really enables something that is very different from any other company in this space," created the impression that Centrellis's commercial viability was imminent, when in FE 3's view, the Centrellis project required five more years of work to reach that state and the amount of work left to do was "absolutely astounding".

100.    The Securities Complaint alleges that FE 3 also disagreed with defendant Schadt's March 14, 2022 statement (set forth above) that Centrellis was "the most extensive and fastest-growing database of clinically relevant patient data in the industry", because at the time of defendant Schadt's statement, there were several other industry databases in the industry that were much more advanced than Centrellis and further, Sema4 did not have a well-curated data set that was growing in a managed way that would be presentable to customers.

101.    According to FE 3's account in the Securities Complaint, defendant Schadt had "irrational exuberance" with respect to Centrellis and did not appear to understand how long it would take and how much further the Company had to go to achieve its objectives.

## VIII.   THE SUSTAINED SECURITIES ACTION

102.    Based on the events set forth and described above, the Securities Action was initiated in the District of Connecticut on behalf of investors who purchased the Company's stock during the "Class Period" spanning from January 18, 2022 through August 15, 2022.  The operative Securities Complaint, based in part on the detailed accounts of the high-ranking FEs, was filed on September 13, 2024.

103.    On June 23, 2025, the motion to dismiss the Securities Action filed by GeneDX and defendants Schadt, Stueland, Ro, and Miao was denied by U.S. District Judge Vernon D. Oliver ("Judge Oliver"). In other words, Judge Oliver concluded based on the allegations set forth in the Securities Complaint that the court "draw the reasonable inference" that defendants Schadt,

Stueland, Ro, and Miao participated in a scheme to defraud GeneDX investors during the Class Period.

104.    In sustaining the Securities Action, Judge Oliver found that all three FE accounts could be fully credited and considered at the pleading stage. Judge Oliver specifically concluded based on the allegations in the Securities Complaint that "it is probable that FE-1 would have had access to information about Centrellis" and that "[s]imilarly, FE-2 and FE-3 were in positions at the Company where it is probable that they would have accessed information about Centrellis." Judge Oliver opined that the three FE accounts in the Securities Complaint "support the claim that, if a reasonable investor viewed the Company's marketing materials or disclosures, it would be understood that there was a piece of technology called Centrellis that allowed the Company to perform capabilities." Judge Oliver further noted that the FEs "testified that, *while there was a piece of technology called Centrellis at the company, the reality is that Centrellis did not exist or lacked the ability to utilize the data in accordance with its objectives*" and therefore held that the FE accounts "*support with particularity the claim that statements regarding Centrellis were misleading*."

105.    Further, Judge Oliver noted that in seeking dismissal of the Securities Complaint, the "Defendants, [] in a conclusory manner, state that Plaintiff does not offer any contemporaneous facts to show actual knowledge of falsity. But…the testimony of the former employees plausibly shows that, because of the weekly meetings regarding Centrellis, statements from the chief executives describing the then-existing capabilities of Centrellis *were knowingly false*."

106.    Moreover, Judge Oliver held that the three FE accounts provided "*strong evidence of scienter, showing that the Individual Defendants had knowledge or access to facts contradicting the public statements*."

107.    Following Judge Oliver's June 23, 2025 ruling, GeneDX and each of the individual defendants to the Securities Action (Schadt, Stueland, Ro, and Miao) are now staring down the barrel of claims sustained against them under Sections 10(b) and 20(a) of the Exchange Act, as the Securities Action proceeds towards trial.

## IX.    DAMAGES TO GENEDX

108.    GeneDX has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct alleged herein.  As a direct and proximate result of the Individual Defendants' misconduct, GeneDX has expended and will continue to expend significant sums of money.  Indeed, the Securities Action was recently sustained, and Judge Oliver's June 23, 2025 denial of the Company's motion to dismiss presages great damages to GeneDX.

109.    Such expenditures include, but are not limited to: (a) legal fees associated with litigation against GeneDX and its officers and directors for violations of the federal securities laws, including the sustained Securities Action; (b) loss of reputation and goodwill, and a "liar's discount"[4] that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace; (c) amounts paid to outside lawyers, accountants, and investigators in connection with any investigation; and (d) loss of revenues and profits.

110.    In addition, the Company now faces massive potential class-wide liability in the Securities Action.

## X.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

---

[4]    "Liar's discount" is a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that GeneDX's ability to raise equity capital or debt on favorable terms in the future is now impaired.

111.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

112.    Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Individual Defendants' wrongdoing alleged herein, and has been a shareholder of the Company continuously since April 2021.

113.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

114.    As a result of the factual allegations set forth herein, Plaintiff has not made any pre-suit demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to institute and vigorously pursue this action.

115.    The Board currently consists of seven (7) directors: defendants Stueland, Ryan, Casdin, Leproust, Meister, Pfennenger, and Ruch.

116.    Under Delaware law, a derivative plaintiff need only demonstrate reason to doubt that a majority of a corporation's directors are disinterested or objective in order to establish pre-suit demand excusal. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that at least four (4) current directors of GeneDX are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

      **A.**      <u>**Defendant Stueland Is Not Disinterested and Is Not Independent**</u>

117.    Defendant Stueland is not a disinterested director because she faces a substantial likelihood of liability based on the related, sustained Securities Action. As alleged herein,

defendant Stueland is a named individual defendant in the Securities Action, and that action overcame the defendants' motion to dismiss and was sustained, notwithstanding materially heightened pleading standards of the PSLRA and Fed. R. Civ. P. 9(b). Thus, defendant Stueland is exposed to potential individual financial liability, cannot be disinterested, and cannot exercise independent business judgment on the issue of whether GeneDX should prosecute this derivative action. Defendant Stueland's liability is not speculative, and her substantial likelihood of personal liability is sufficient to excuse demand.

118. Notwithstanding that she is an interested director, there is also reason to doubt that defendant Stueland is capable of independently considering a demand to commence and vigorously prosecute this action, because defendant Stueland's principal professional occupation is her employment as CEO of GeneDX. As CEO of the Company, defendant Stueland has earned and stands to earn millions of dollars in annual salary, bonuses, and other compensation. Accordingly, defendant Stueland is incapable of independently considering a demand to commence and vigorously prosecute this action against those defendants who control her annual compensation. The Company's annual proxy statements on SEC Form DEF 14A, including its most recent proxy statement issued on April 30, 2025, also admit that defendant Stueland is not an independent director.

**B.     Defendant Ryan Is Not Independent**

119. There is reason to doubt that defendant Ryan is capable of independently considering a demand to commence and vigorously prosecute this action, because in connection with his role as Executive Chair, defendant Ryan was compensated as an executive officer pursuant to an employment agreement. The Company's annual proxy statements on SEC Form DEF 14A,

including its most recent proxy statement issued on April 30, 2025, admit that defendant Ryan is

not an independent director.

### C. Defendants Meister, Leproust, and Pfennenger Each Face a Substantial Likelihood of Liability as Members of the Audit Committee

120.    Demand is also excused as to defendants Meister, Leproust, and Pfennenger, who

each face a substantial likelihood of liability.  As alleged herein, defendants Meister, Leproust,

and Pfennenger have served and continue to serve as members of the Audit Committee.  The Audit

Committee Charter states that the members of the Audit Committee are responsible for, among

other things: (1) reviewing, and discussing with management and the Independent Auditors prior

to distribution to the public, GeneDx's quarterly and annual financial results, earnings press

releases and other public announcements regarding GeneDx's operating results; (2) reviewing and

discussing with GeneDx's management and the Independent Auditors, and providing oversight

over, the design, implementation, adequacy and effectiveness of GeneDx's accounting and

financial processes, and systems of internal controls and material changes in such controls,

including any significant deficiencies and material weaknesses in their design or operation; (3)

reviewing with management GeneDx's major financial risks and enterprise exposures and the steps

management has taken to monitor or mitigate such risks and exposures, including GeneDx's

procedures and any related policies with respect to risk assessment and risk management; and (4)

reviewing with management GeneDx's (a) programs for promoting and monitoring compliance

with applicable legal and regulatory requirements, and (b) major legal and regulatory compliance

risk exposures and the steps management has taken to monitor or mitigate such exposures.

121.    Notably, the Company has a history of material weaknesses in its internal

controls. For example, as acknowledged in the Company's 2021 Form 10-K (signed by Meister

and Leproust), material weaknesses in the Company's internal controls over financial reporting

had been identified as of December 31, 2020, and had not been fully remediated as of December 31, 2021. Further, the 2021 10-K notes that "during 2021, management identified a misclassification related to certain costs included within cost of services for the years ended December 31, 2021, 2020 and 2019."

122.    In connection with these material weaknesses in internal control over financial reporting, the Company was forced to restate its annual 2020 and 2019 financial statements to correct misstatements pertaining to the misclassification of certain expenses related to the genetic counseling department reported in cost of services that should have been reported in selling and marketing in the prior period financial statements.

123.    Additionally, the Company restated its 2021 and 2020 interim financial statements. The Company identified quarterly out of period adjustments generally related to recognition of cost of services in the quarterly periods ended March 31, 2021, June 30, 2021 and September 30, 2021. The adjustments also affected certain current asset and liability accounts previously reported in the condensed balance sheets as of March 31, 2021 and June 30, 2021 and condensed consolidated balance sheets as of September 30, 2021.

124.    Nonetheless, defendants Meister, Leproust, and Pfennenger caused and/or permitted the Company to issue the series of false and misleading public statements complained of herein (which Judge Oliver concluded were sufficiently alleged in the Securities Action to have been part of a fraudulent scheme), and to adopt and maintain ineffective and inadequate internal controls and procedures with respect to its disclosures.  Accordingly, there is reason to doubt that defendants Meister, Leproust, and Pfennenger would respond to a stockholder demand impartially and disinterestedly, and they each face a substantial likelihood of liability.

### D.    Every Director Who Signed the False and Misleading 2021 10-K Faces a Substantial Likelihood of Liability, Excusing Demand

125.    Defendants Ryan, Casdin, Leproust, Meister, and Ruch, who constitute a majority of the current members of the Board, have demonstrated their inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein.  Every Board member has acted in violation of their fiduciary duties to the Company's stockholders, as described herein.

126.    For example, defendants Ryan, Casdin, Leproust, Meister, and Ruch each approved and signed the Company's materially false and misleading 2021 10-K. Therefore, no reasonable stockholder would reasonably believe that a majority of the members of the Board would be able to disinterestedly, independently, and properly consider a demand in good faith and, accordingly, demand is excused.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### For Breach of Fiduciary Duties
### Against All Individual Defendants

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    As GeneDX's directors and top officers, the Individual Defendants owed GeneDX and its shareholders fiduciary duties of loyalty, candor and good faith – the highest duties known to the law.  Rather than speak the entire truth when they said, or caused anything to be said, about the Company, the Individual Defendants breached their fiduciary duties by disseminating false and misleading statements.

129.    As a result of the Individual Defendants' fiduciary failures, GeneDX has been damaged.

130.    Plaintiff, on behalf of GeneDX, has no adequate remedy at law.

## COUNT II
### For Unjust Enrichment
### Against All Individual Defendants

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of GeneDX.

133.    All the payments and benefits provided to the Individual Defendants were at the expense of GeneDX.  The Company received no benefit from these payments.

134.    Plaintiff, on behalf of GeneDX, seeks restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

135.    Plaintiff, on behalf of GeneDX, has no adequate remedy at law.

## COUNT III
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Individual Defendants

136.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R.§240.10b-5, promulgated thereunder by the SEC.

138.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated and/or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon stockholders.

140.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Sema4 were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

141.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Sema4, their control over, and/or receipt and/or modification of Sema4's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Sema4, participated in the fraudulent scheme alleged herein.

142.    As a result of the foregoing, the market price of Sema4 common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Sema4 common stock in purchasing Sema4 common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

143.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the sustained Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused Sema4 to expend significant defense costs and exposed the Company to millions of dollars in potential class-wide damages in the sustained Securities Action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duty, corporate waste, unjust enrichment, and violation of the federal securities laws;

B.    Directing GeneDX to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GeneDX and its shareholders from a repetition of the damaging events described herein;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and the state statutory provisions sued hereunder, including attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of from the Individual Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of GeneDX has an effective remedy;

D.    Awarding to GeneDX restitution from the Individual Defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

   E.  Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

   F.  Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

  Plaintiff demands a trial by jury.


Dated: August 15, 2025       Respectfully submitted,

               **RIGRODSKY LAW, P.A.**


               _/s/ Seth D. Rigrodsky_
               Seth D. Rigrodsky (#3147)
               Gina M. Serra (#5387)
               Herbert W. Mondros (#3308)
               1007 North Orange Street, Suite 453
               Wilmington, DE 19801
               Phone (302) 295-5310
               Facsimile: (302) 654-7530
               Email: sdr@rl-legal.com
               Email: gms@rl-legal.com
               Email: hwm@rl-legal.com


               _Attorneys for Plaintiff_

**OF COUNSEL:**

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
Email: rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Ave.
Ardmore, PA 19003
(303) 861-3003
Email: brett@shumanlawfirm.com